The **SHIELD CLUB, et al., Plaintiffs,**

v.

**CITY OF CLEVELAND, et al., Defendants.**

Civ. A. Nos. C72–1088, C77–346.

United States District Court, N.D. Ohio, E.D.

July 15, 1986.

Supplemental Memorandum and Order Nov. 5, 1986.

Harold L. Williams, Cleveland Legal Aid Society, Gordon J. Beggs, American Civil Liberty Union, Cleveland, Ohio, for plaintiffs.

Irving Berger, Law Director, City of Cleveland, City Hall, Cleveland, Ohio, for defendants.

Susan Gragel, Rotatori & Gold, Cleveland, Ohio, for intervenor Fraternal Order of Police.

Douglas J. Paul, Chattman, Garfield, Friedlander & Paul, Cleveland, Ohio, for intervenor Cleveland Police Patrolmen's Ass'n.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Forty-three cadets in the 95th Police Academy class were required to submit urine specimens on October 21, 1985. SmithKline Bio-Science Laboratories, Inc. performed EMIT (Enzyme Multiplied Immunoassay Technique) assays on the urine specimens. The assays produced positive results for the presence of marijuana or other controlled substances for 10 out of 20 minorities, and for 3 out of 23 non-minorities. These results were confirmed by an alternate testing method known as radioimmunoassay (RIA) performed on the same specimens. Twelve of the 13 cadets who had tested positive submitted second urine specimens on October 22, 1985 for gas chromatography/mass spectrometry analysis (GC/MS), which also confirmed the original results.[1]

1. One cadet resigned without submitting a second urine sample.

I.

A.

Thereafter, a hearing was held on January 24, 1986 pursuant to this court's guidelines of January 21. Plaintiffs Shield Club, et al. requested, pursuant to paragraph 7 of the amended consent decree of December 21, 1984, discovery of data relating to the urine testing on October 21, 1985 of the 43 police patrol cadets. Defendant city and intervenor FOP moved for protective orders against plaintiffs' noticed depositions and other discovery requests. In its guidelines, the court ruled that the Shield Club could not engage in unrestricted discovery under the Federal Rules of Civil Procedure in enforcing its rights under paragraph 7. However, the court permitted the plaintiffs to ask leave for discovery

relating to employment of urine testing of police patrol cadets on or about October 21, 1985, because on the record presented there is a sufficient likelihood that urine testing of police patrol cadets to ascertain any use of controlled drug substances or illegal chemical substances is a "post-examination screening procedure[ ]" within the meaning of paragraph 2(b) of the amended consent decree.

At the January 24 hearing the court directed the city, over its objection, to produce identified laboratory testing materials ("the objective documents") relating to the testing of urine samples of the cadets. These records were produced at the hearings of February 7 and 25 and were inspected by the court and counsel for the plaintiffs. At the close of the February 7 hearing counsel for the plaintiffs stated "we would like to have a toxicologist look at the records under the court's supervision so they can discuss them with us." Counsel for the city opposed this request:

We believe that a showing should be made that the field of toxicology has any bearing on the issue of discrimination on this case before we get to that.

Thereupon, the court formulated this threshold issue:

> We will ask you to make a request for a toxicologist to serve several purposes. You can list them all, and we'll have to decide that threshold question, if it makes any difference whatever [the toxicologist] might tell you about these records as it bears on this question of discrimination. And then, if indeed I find that it might, then I will grant your request [to let the toxicologist look at the SmithKline records].[2]

Simply, the threshold issue may be paraphrased as follows:

> Can a toxicologist's examination and report on the urine testing data collected by the city possibly "bear [ ] on [the] question of discrimination"?

### B.

On March 18, 1986 plaintiffs filed their "Brief Re: Drug Testing." They contend that the urine test, administered to police patrol cadets on October 21, 1985, "adversely affected the minority police patrol cadets." Plaintiffs note that "[t]he city retained ninety-one percent of the non-minority cadets, but only forty-four percent of the minority cadets after the test." In addition to developing their adverse impact argument and other arguments, plaintiffs advance an argument supported by the attached affidavit of a toxicologist, Dr. James Woodford, and other affidavits and exhibits.

In his ten-page affidavit, Dr. Woodford presents what may be called a melanin theory to show that the assays performed on the urine specimens of the minority cadets could be racially biased. As his first hypothesis he states:

> There can be racial bias in the EMIT, RIA and GC/MS marijuana screening tests for the following reasons: Melanin, the bodily substance responsible for skin

tone, occurs in urine as conjugated fragments which closely resemble urinary cannabinoid fragments in terms of physical size, positioning of atoms and bond lengths such that these screening tests may misidentify the melanin fragments as cannabinoids. Some melanin fragments have chemical dimensions and atoms in the right places to fit into the EMIT and RIA antibody slots. Some melanin fragments have the same mass to charge ratio which the GC/MS test can mistake for cannabinoids. GC/MS is tuned to look for cannabinoid fragments. This spectral region has been identified as containing large amounts of melanin derivatives.

The melanin theory underlying plaintiffs' claim was not disclosed to the court and opposing counsel until plaintiffs' filing of March 18, 1986. The city, thereafter, chose to respond with a Motion "Re Further Proceedings in Connection With Plaintiffs' Allegations as to Drug Testing" (hereafter, Motion Re Further Proceedings). The defendant city urges:

> The brief filed by plaintiffs fails to indicate the nature of the relief they seek. Since the minority patrol officer trainees who voluntarily resigned their positions in the aftermath of the testing were replaced by additional minority trainees in the current academy class, it is apparent that no retrospective relief would in any event be appropriate. Moreover, since the city has followed the practice, pursuant to the court's orders of October 29, 1981 and February 24, 1986, of replacing with other minority persons all minority persons who for any reason fail to complete Academy training and become sworn in as police officers, it has yet to be shown why the *class* represented by plaintiffs has any justifiable interest in resolving the issue plaintiffs have raised.

In the guidelines for the January 24 hearing the court declared:

---

2. In evolving the threshold issue, the court earlier ruled that "once those records [Lt. Groudle and Smith-Kline] are in, plaintiff may make a formal request for the [use] of a toxicologist or for any other relief that I believe is proper and appropriate and submit a supporting brief and let the city respond to it."

3(c). [U]nder the amended consent decree, the court is not concerned with the impact of any urine testing of particular minority policy patrol cadets for drug or chemical substances, but rather with the city's obligation to comply with requirements of paragraph 4 of the amended consent decree [the hiring preference provision], particularly the introductory language of subsection (a) of paragraph 4.

This court's order of February 24, 1986, applying the order of October 29, 1981 to the amended consent decree, is consistent with this third factor which the court said would "collectively be considered" in "judging whether utilization of the post-examination procedure of urine testing is a non-discriminatory or discriminatory selection criterion." Hence, at the outset of this memorandum and order, the court concludes and determines that it will not consider in this proceeding any relief that would retrospectively affect or modify the terminations[3] of the ten minority cadets of the 95th academy class who resigned on October 23, 1985.[4]

 However, the court overrules the defendant city's objection that the plaintiffs lack standing to press their motion for further discovery. Plaintiffs have standing, under paragraph 7 of the amended consent decree and the concomitant court-imposed procedures, to request discovery from the city if they can support a class-based claim that the city's urine testing discriminates against minority cadets as a class.

 Furthermore, it is concluded that the court may treat plaintiffs' motion and affidavit of Dr. Woodford as a class-based request for prospective modification of the present mode of drug testing. This treatment is warranted, since any ultimate finding by the court that there is a scientifically acceptable basis for the melanin theory might well require the court to order the city to modify its use of EMIT, RIA, and GC/MS assays in conducting drug testing. Anticipating that the court may "deal with the issue for prospective purposes (i.e. future drug screening procedures as to police officer applicants and trainees)," the city moves the plaintiffs

> to disclose to the Court and to the City all the empirical bases upon which their claimed expert premises the racial bias theory set forth in his Affidavit and his proposal as to the proper means by which drug screening may be conducted that would eliminate the "racial bias" claimed to inhere in the types of testing used in October, 1985.

The various briefs and motions,[5] the affidavits, and the attached exhibits make up the record upon which the court considers the formulated threshold issue and any derivative issues raised by the parties.

## II.

Plaintiffs concede that "the City is probably warranted in denying final appointment to any police patrol cadet who is a user of a controlled drug substance or other illegal chemical substance." They contend, however, that because urine testing is a "post-examination screening procedure" that

---

**3.** As one cadet stated in an affidavit, "Sgt. James told us that it would be better to sign the letter of resignation because if we took the termination, it would be for drug abuse, and that would make it difficult to get a job."

**4.** The court expressly rejects plaintiffs' suggestion in their reply brief that "[i]f minority cadets lost their jobs as a result of a violation of the Amended Consent Decree, [the court's] relief could include, on a class basis, reinstatement, back pay and appropriate retroactive benefits."

**5.** Intervenors FOP and CCPA each filed a brief "Re: Drug testing" after the city filed its "Mo-

tion Re Further Proceedings." Thereafter, the plaintiffs filed a reply brief re: drug testing. The city then filed a reply brief in response to plaintiffs' brief re: drug testing and in support of its motion. The city later filed two "supplements" to its reply brief. Thus, the court has been well briefed.

The city did not obtain leave to file its reply brief, *see* Local Civil Rule 3.02, and the city did not obtain leave to file its supplemental briefs or the letters or copies of letters it has filed with the court. However, the court has found each of the pleadings and attachments helpful and retroactively grants leave to the city.

"may have been racially biased" and that "adversely affected" the minority police cadets, the discovery they seek "bears on th[e] question of discrimination." Plaintiffs further maintain that paragraph 2 of the amended consent decree[6] makes the EEOC Uniform Guidelines on Employee Section Procedures applicable to urine testing.

Intervenors FOP and CPPA both challenge the plaintiffs' conclusion that urine testing is a "post-examination screening procedure" and thus a "selective criterion" under paragraph 2 and under the EEOC guidelines. The CPPA argues that the urine testing here, designed to detect voluntary use of illegal drugs, is better characterized as part of a "disciplinary proceeding than ... [as] a hiring selection criterion." The FOP adds that "the Guidelines clearly do not apply to scientific tests where results are measured by purely objective standards."

In its April 29 reply brief defendant city thus responds to plaintiffs' contentions concerning the applicability of the EEOC Uniform Guidelines to urine testing:

Plaintiffs' focus upon the EEOC Uniform Guidelines on Employee Selection Procedures is an exercise in irrelevancy. There is no dispute that the City's criterion (non-use of marijuana or other illegal substances) is valid for the hiring or retention of police officers. Regardless of whether or not the EEOC Guidelines con-

template applicability to such testing, it is not disputed that if the melanin theory reflected fact, the testing would be racially discriminatory.

In *Shield Club v. City of Cleveland,* 8 E.P.D. ¶ 9614 at 5635 (N.D.Ohio July 6, 1974), this court directed the Civil Service Commission to draft

a set of written standards that will prohibit and prevent any racially discriminatory practice or procedure in all aspects of the screening of persons (male and female) who have passed the CPD written entrance examination. Not intending to exclude any aspect not herein mentioned, the court directs that the foregoing standards shall apply to the personal history interview, and background investigation of each person, *the medical examination,* and the psychological and/or psychiatric examination (emphasis presently added).

This July 6, 1974 direction to the Civil Service Commission was reaffirmed in this court's order of April 22, 1976. The Commission was further directed on July 6, 1974 to formulate standards that "will prohibit and prevent any racially discriminatory practice or procedure in all aspects of screening" of the persons who had passed the "CPD written entrance examination."

As seen, the above standards were to apply to "the medical examination."[7] The

---

6. 2. The defendants shall utilize only such selection criteria for the hiring of police patrol officers as are non-discriminatory and demonstrably job related in a manner guided by the EEOC Uniform Guidelines on Employee Selection Procedures. The selection criteria referred to herein include, but are not limited to, the following:

a) entrance examinations; and

b) post-examination screening procedures. The previously approved screening procedures (Court order dated April 22, 1976) may continue to be employed, except insofar as they may conflict with the other provisions of this order.

7. The report of the Civil Service Commission, found to be consistent with the court's order of July 6, 1974, was attached to and made a part of the court's order of April 22, 1976. The only mention of "Medical Examination" is contained in the "OVERVIEW OF SCREENING PRO-

CESS." Nothing contained in said report, see for example section III "Further Grounds for Rejection of Candidates by the Safety Director" and paragraph B, is deemed to have restricted or prevented the Civil Service Commission from its later development and promulgation of its "Medical Standards and Requirements" for police and fire service applicants.

It is determined that the Civil Service Commission's "Medical Standards and Requirements" were developed by the Civil Service Commission pursuant to this court's order of July 6, 1974, which order was reaffirmed by and incorporated in pertinent part in the court's April 22, 1976 order. As seen, paragraph 2 of the amended consent decree (Section 9 of the consent decree) refers to these "previously approved screening procedures (Court order dated April 22, 1976)."

Civil Service Commission Manual of "Medical Standards and Requirements" (revised 8–21–78) (hereafter the Manual) requires each eligible applicant to receive "a complete and thorough physical examination." The Manual includes eight categories of examination. The eighth category, entitled "Laboratory," lists as one of three items "Urine for complete urinalysis." Thereafter, a separate chapter meticulously details each of ten separate physical systems. In each chapter "causes for rejection" are specifically itemized by disease or other prescribed physical condition.

The eleventh chapter, entitled "Other Medical Conditions," deals separately with nine different subjects. The first subject, *"Drug Use and Abuse Not Addiction,"* lists four "causes for rejection"; the first cause is presently pertinent: [8]

(a) Drug abuse characterized by:

(1) The evidence of use of any narcotic drug, amphetamine or hallucinogenic substance *at time of examination* when the use cannot be accounted for as the result of the advice of a recognized health care practitioner (emphasis added).[9]

As noted, the Manual provides for compulsory "urinalysis" as part of the medical examination. While this urine testing requirement would embrace wide profile testing for "sugar" and other signs of disease, the compulsory urinalysis requirement is not restrictive. It is determined that its breadth embraces taking urine specimens to test for indication of current drug use.

Evidence in the record demonstrates that urine testing for the presence of marijuana and other controlled substances is carried out by the Safety Department Medical Bureau, identified as the "Medical Department of the Police and Fire Service" in the Manual. Thus, then Chief William T. Hanton described the urine testing, in a letter to police applicants, as "the final phase of your medical examination."

Consistently, the Medical Bureau Medical Director, Godofredo Domingo, M.D. notified a cadet in the 96th academy class that

following a complete evaluation of your recent medical examination, you are classified (B) Medically Unacceptable for the following reason:

Positive testing for Cannabinoids (Marijuana) based on supplementary urine sample from October 26, 1985.

Dr. Domingo further notified the applicant that this was "in accordance with the medical standards and requirements for police and fire service applicants by the Civil Service Commission of the City of Cleveland." Obviously he was referring to the Manual.[10]

Thus, the Manual documents that "evidence of use of any narcotic drug, amphetamine, or hallucinogenic substance at the time of examination," unaccounted for by

8. The fourth cause permits waivers in "cases indicating use of marijuana (not habitual use)" under certain circumstances and providing, among other things, "there is evidence of *current* drug abstinence" (emphasis added).

9. The categories of drug use "at the time of examination" that provide "causes for rejection" are broad enough to embrace drug substances that fall within 21 U.S.C. § 812 (1982), Schedule I and Schedule II controlled drug substances. For example, Marijuana is a Schedule I drug. "Hallucinogenic substance" is a category that embraces marijuana, even if marijuana were not properly classified as a "narcotic drug." Marijuana "produces a number of physiological and psychological effects." *Nat'l. Org. for Reform of Marijuana Laws (NORML) v. Bell,* 488 F.Supp. 123, 128 (D.D.C.1980) (three judge court). The 21 U.S.C. § 802(17) (1982) definition of "narcotic drug" embraces "cocaine," an extraction from coca leaves, and cocaine is included within Schedule II controlled substances. Although pharmacologically classified as a "non-narcotic central nervous system stimulant" courts hold that it is within the prerogative of Congress to "classify cocaine as a narcotic for penalty and regulatory purposes," *United States v. Whitley,* 734 F.2d 1129, 1141 (6th Cir.1984) and cases cited therein. Amphetamines are drugs that fall within both Schedule II and Schedule III controlled substances. 21 U.S.C. § 812.

10. Because urinalysis is properly analyzed as a component of the medical examination, it is unnecessary to discuss this court's previous ruling on the use of polygraph examinations, *Shield Club v. City of Cleveland,* 8 E.P.D. ¶ 9,614 (N.D.Ohio July 6, 1974).

medical advice, at least since 8–21–78 has been a "cause[ ] for rejection" of an eligible police or fire applicant. This medical "cause for rejection," one of the medical standards and requirements of the city, thus underpins and particularizes the city's employment policy which denies "final appointment of any police patrol cadet who is a user of a controlled drug substance." Chief Hanton gave one justification for this employment policy in his testimony of December 16, 1985 before the Civil Service Commission. He testified:

> I advised the recruits [on October 23 at the Police Academy] that since the tests had proved positive there was no way we could put recruits on the streets with hand weapons who were using illegal substances.

Based upon the non-delegable responsibility of the city through its police department to maintain public safety and to enforce and uphold state and federal laws and city ordinances prohibiting or criminalizing the possession, sale or distribution of controlled drug substances, and upon the entire record, it is concluded that the city is warranted in denying final appointment of any police patrol cadet who is a user of a controlled drug substance.[11]

■ As seen, plaintiff now concedes this employment principle.[12] Because this municipal employment policy has a self-evident governmental purpose it is concluded that this policy is "demonstrably job related" and the policy need not otherwise be validated. Furthermore, the particular medical standard under present consideration, that "evidence of use of any narcotic drug, amphetamine or hallucinogenic sub-

stance at the time of examination" is a "cause[ ] for rejection," is shown on this record not to be a "racially discriminatory practice or procedure."[13] When body fluids and particularly urine are sampled and subjected to objective testing that is scientifically accepted to show the use or nonuse of marijuana or other controlled substances, such testing is not inherently discriminatory. This assumes, as all counsel seemed to agree at the January 24, 1986 hearing (Tr. 45, line 17 to Tr. 46, line 9), that "chemical testing" operates in the same manner on the body fluids of minorities as it does on the body fluids of non-minorities. If that assumption is true no EEOC validation would be required. If the assumption is not true and the melanin theory "reflect[s] fact," urine testing would be, as the city concedes, "racially discriminatory."

### III.

As seen, paragraph 2 of the amended consent decree of December 21, 1984 (paragraph 9 of the original consent decree of November 11, 1977) states in its first sentence:

> The defendant shall utilize only such selection criteria for the hiring of police officers as are non-discriminatory and demonstrably job related in a manner guided by the EEOC Guidelines on Employment Section Procedures.

While this sentence places "and" between "non-discriminatory" and "demonstrably job related," the word "and" will be construed as "or" to foster the purposes of the Consent Decree. Thus, two alternate standards were provided. The permissible selection criteria must be: (1) non-discrimina-

---

**11.** The term "controlled drug substances" as here used is intended to be congruent with the categories specified in Manual of Medical Standards and Requirements for Police and Fire Service applicants, *"Drug Use And Abuse Not Addiction,"* Chapter XI, p. 30.

**12.** *See also Davis v. City of Dallas,* 777 F.2d 205, 223–25 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986).

**13.** Following the use of this quoted language in its order of April 22, 1976, this court held on September 27, 1976 that "[t]he Shield Club's

discrimination suit against the Cleveland Police Department is based on the Fourteenth Amendment Equal Protection Clause." Later in the opinion, the court ruled:

> Applying the teachings of *Washington v. Davis* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ] it is now manifest that a racially discriminatory purpose or policy in making assignments and transfers must be shown in order to establish the Shield Club's claim that assignments are made within the CPD in a discriminatory manner.

tory or (2) demonstrably job related in a manner guided by the EEOC Guidelines on Employment Selection Procedures.

■ As for the provision that selection criteria must be "non-discriminatory," the past history of the case dictates that to violate the standard a racially discriminatory purpose or policy must be manifested.[14] However, it is not likely that Shield Club has this meaning of "non-discriminatory" in mind when it urges in its first brief that

> Dr. Woodford's comments warrant careful scrutiny of the drug tests by the court and the parties to determine if the city is complying with the requirement of ¶ 12 of the Amended Consent Decree which requires non-discriminatory selection criteria for the hiring of police patrol officers.

Shield Club's reliance on Dr. Woodford's melanin theory to support its contention that the "Emit and RIA screening tests … may have been racially biased" appears rather to be based on a disparate impact claim. Previously in its first brief, under the heading of "ADVERSE IMPACT AND DEFENDANTS' RESPONSIBILITIES UNDER CONSENT DECREE," Shield Club states:

> A selection procedure is considered discriminatory under the Uniform Guidelines where it has an adverse impact on the employment opportunities of members of any race, sex or ethnic group [29 CFR § 1607.3(A) ].

Of course, the guidelines' "Purpose" includes the statement that "[t]hese guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results." 29 C.F.R. § 1607.1(B). Moreover, "Use of a selection procedure is in compliance with these guidelines … if such use does not result in

adverse impact on any race…." 29 C.F.R. § 1607.16(C). Hence the court will examine the adverse impact contentions of the plaintiffs. The court proceeds with this examination although it previously has determined that for the reasons given neither the City's policy disqualifying from employment users of marijuana or other drug controlled substances nor the use of urine specimens requires validation to show that either the policy or the assays are job related.

Pointing to the results of the October 21, 1985 test and calculating the application of the "four-fifths rule" in the EEOC Uniform Guidelines, plaintiffs conclude that

> [t]he defendants' drug screening test has clearly had an adverse impact upon the minority cadets … and clearly creates an inference of discrimination under the Uniform Guidelines.

In response to plaintiffs' disparate impact argument, the city represents that in the interim SmithKline has performed assays in November 1985 on urine samples of 90 persons whose names appeared on the then current civil service police eligible list and on urine samples of 45 (of the 90) who comprised the 96th Police Academy class and who were tested on May 12, 1986. The city states that as to the group of 90 persons tested in November 1985, 4 of 42 minority persons and 3 of 48 non-minority persons tested positive for marijuana use. The city has also reported to the court that

> [o]n May 12, 1986, each of the 45 members of the current Police Academy class, which persons were appointed on February 24, 1986, consisting of 23 minority persons and 22 non-minority persons, submitted urine samples which were sent to SmithKline Bio-Science Laboratories for drug testing. *Each and every mem-*

---

**14.** Reasonably construed, this "racially discriminatory purpose" requirement of the 1976 decision, *supra* note 13, was adopted a year later as the first selection criteria, i.e. "non-discriminatory purpose" in paragraph 9 of the 1977 consent decree. The alternate selection criteria standard is that the selection criteria be "job related in a manner guided by the EEOC Guide-

lines on Employment Selection Procedures." To challenge a selection criteria under this alternate standard a statistical showing of disparate impact as threshold or prima facie proof of racial discrimination is required. *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979).

*ber of the class tested negative for marijuana.*

The city has provided no further information to the court with respect to the two drug abuse screenings performed subsequent to the first, 95th academy class testing.

■ Assuming the same or similar testing procedures were used in the November 1985 and May 12, 1986 tests, the aggregate results may be considered. *See Chrisner v. Complete Auto Transit, Inc.,* 645 F.2d 1251, 1257 & n. 2 (6th Cir.1981); *See also Fudge v. Providence Fire Department,* 766 F.2d 650, 656–57 (1st Cir.1985) (the court held that "lumping" of test statistics is permissible only if "testing episodes" are "sufficiently similar"). So combined, the aggregate statistics vitiate plaintiffs' claims of adverse impact.

Plaintiffs' only reply to the city's statements concerning the additional urinalysis performed on the subsequent academy classes has been to point out that "[n]either the plaintiffs, the Court, the FOP nor the CPPA has had access to the results and underlying data ..." Apart from Dr. Woodford's theories examined in Part IV, but assuming the city's representations are accurate, plaintiffs cannot use the disparate impact of the city's drug screening program as a springboard and justification for further discovery of "the results and underlying data" under the amended consent decree. *Accord, New York v. Beazer, supra; General Electric Co. v. Gilbert,* 429 U.S. 125, 137 n. 14, 97 S.Ct. 401, 409 n. 14, 50 L.Ed.2d 343 (1976) (*Griggs* burden of showing job-relatedness arises only after discriminatory effect has been shown); 29 C.F.R. § 1607.1(B). Discussion of the production of the results of the October 26 and May 12 testings is deferred until Part V. In the intervening part the court takes up Dr. Woodford's melanin theory.

## IV.

As seen, plaintiffs principally rely on the melanin theory of Dr. James Woodford on how race bias can occur in standard marijuana screening tests. Dr. Woodford's first hypothesis regarding melanin fragments is set out above, *supra* at p. 277. As a second hypothesis, Dr. Woodford asserts that whole melanin distributed through the body and blood stream "tends to hold and congregate drugs" and thereby "change the marijuana clearance and detection time for individuals."

Plaintiffs take the position that "Dr. Woodford's comments warrant careful scrutiny of the drug tests by the court" to determine compliance with paragraph 2 of the amended consent decree. As seen the city's principal response to Dr. Woodford's affidavit is a request that plaintiffs supply "empirical bases" for the melanin theory. In addition, the city represents that it "stands ready to seriously consider [the empirical bases], and in the event [the melanin theory's] validity is apparent, to alter its testing procedures accordingly." In turn, plaintiffs condition their accession to this request for evidence on the city's agreement to allow the plaintiffs' original discovery requests.

■ A court scrutinizes experts' affidavits when "unsupported assumptions" and "theoretical speculations" are not backed up with "specific facts" or "grounds reasonably relied upon by experts in a particular field forming opinions or inferences upon the subject." *United States v. Various Slot Machines on Guam,* 658 F.2d 697, 700 (9th Cir.1981) (quoting *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–3 (D.C.Cir.1977)); *see Bieghler v. Kleppe,* 633 F.2d 531, 534 (9th Cir.1980). More to the point, "opinion testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit." J.W. Moore & J.C. Wicker, 6 Moore's Federal Practice ¶ 56.22[1] at 56–1315 and –1316. The admissibility of opinion testimony with respect to a scientific principle or discovery is usually determined by the application of the "general acceptance" principle enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). The Sixth Circuit has defined "general acceptance" under *Frye* as

"synonymous with reliability. If a scientific process is reliable, or sufficiently accurate, courts may also deem it 'generally accepted.'" *United States v. Distler*, 671 F.2d 954, 961 (6th Cir.1981) (quoting *United States v. Franks*, 511 F.2d 25 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975)).

The inquiry whether methods or theories are generally accepted as reliable in the field can involve determining if they have received "a significant degree of national and international recognition," *Distler, supra* 671 F.2d at 961–62; if published or unpublished scientific literature exists relating to the subject matter, *see United States v. Stifel*, 433 F.2d 431, 440–41 (6th Cir.1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); and if an expert's tests have been duplicated or if authority exists in the field for novel theories, *see United States v. Brown*, 557 F.2d 541, 557 (6th Cir.1977).

These standards assist the court in determining how to proceed upon plaintiffs' discovery request and defendant city's counter-request for a showing of the "empirical bases" for Dr. Woodford's conclusions. Dr. Woodford's affidavit outlines two hypotheses supporting his statement that dark skin tone "could" affect the outcome of an EMIT, RIA or GC/MS marijuana screening test. Dr. Woodford does not refer at any point in his affidavit to any reported or unreported laboratory or scientific experiment conducted, by himself or by any other scientist or technician, to support or verify his two hypotheses. He does refer, however, to general data and specific situations in which black persons tested positively for marijuana use at a higher rate than for white persons. He makes the statement "[m]y studies indicate that positive results for blacks in EMIT, RIA, and GC/MS tests can be the result of melanin interference," affidavit ¶ 6 at 6, but he does not discuss or further elucidate the "studies" mentioned. He refers to one case in

which he was "able to demonstrate through laboratory testing an absolute correlation between marijuana positive and melanin positive results." *Id.* This cryptic statement alludes to a "laboratory testing" but does not on its face indicate that the correlation observed between the two values "marijuana positive" and "melanin positive" can be attributed to the interference theory which he has postulated.

Defendant city presents several sources disputing the validity of Dr. Woodford's melanin interference hypothesis. Most significantly, defendants refer the court to the results of a study published in the Journal of Analytical Toxicology, July/August 1985 issue. Published in the form of a detailed letter to the editor, Dr. M.A. Elsohly, et al., from the University of Mississippi Research Institute of Pharmaceutical Sciences and Department of Pharmaceutics, developed and conducted a study to ascertain whether individuals with high serotonin levels or blacks with high melanin levels would interfere with either the screening or confirmation of the urinary metabolite signaling the presence of marijuana use. Dr. Elsohly, et al. concluded that

> the concern that certain indole carboxylic acids, particularly in melanin and serotonin metabolites, might interfere in the screening and/or confirmation of the THC–COOH [marijuana metabolite] in urine is totally unjustified.

The defendants also observe that Dr. Woodford's conclusions are inconsistent with the results of the November 1985 and May 12, 1986 testings performed by the city.

The court has before it, then, Dr. Woodford's affidavit outlining his hypotheses, the city's representations on the race-neutral results in the November 1985 and May 12, 1986 testings, and the materials submitted by the city which in varying degrees contradict the conclusions of Dr. Woodford (these include the published Elsohly study and the materials identified in the margin).[15]

---

**15.** The court finds it remarkable that the EMIT test, for example, in use in this country now for

more than 10 years (*see* Testimony of Dr. Joyce Chang, SVYA Corporation technical director,

In this state of the record, there is not a sufficient factual predicate to support Dr. Woodford's melanin interference hypotheses to warrant this court, as the trier of fact, as well as the judge charged with construing and applying the pertinent law, to grant Dr. Woodford access to the SmithKline test data for application of his racial bias theory. However, if he should show sufficient scientific support for his hypotheses this would be enough to presume an adverse impact on the class of minority cadets.

When and if that happens the court may grant plaintiffs' request that Dr. Woodford or some other toxicologist be permitted to review results of the drug screenings. However, until Dr. Woodford's theory is demonstrated to be more than an unsupported assumption or speculation the court declines plaintiffs' request that he see and examine these results.

In order to determine whether or not the melanin interference theory is "reliable, or sufficiently accurate," *Distler, supra,* 671 F.2d at 961, the court directs plaintiffs to supplement Dr. Woodford's affidavit with creditable and authoritative data that respond to the following subjects and questions: [16]

1. Dr. Woodford's statements in ¶ 4 of his affidavit, specifically:

a. That melanin occurs in urine as conjugated fragments;

b. That melanin fragments closely resemble urinary cannabinoid fragments in physical size and positioning of atoms and bond lengths;

c. That some melanin fragments have chemical dimensions and atoms to fit into the EMIT and RIA antibody slots;

d. That some melanin fragments have the same mass to charge ratio which the GC/MS test can mistake for cannabinoids;

e. That the GC/MS spectral region has been identified as containing large amounts of melanin derivatives.

Transcript of August 28, 1984 Hearing at 41, in *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky. 1985)), has thus far escaped detection of such a serious flaw.

On the contrary, Dr. Joyce Chang testified in *Higgs v. Wilson* that SYVA Corporation has analyzed over 175 substances and has yet to discover a substance that the EMIT test falsely identifies as a cannabinoid. Transcript of August 28, 1984 Hearing at 56, 89. Pursuing Dr. Chang's admission that some false positives could nevertheless occur in EMIT tests, Judge Johnstone pressed the following question:

So what I'm driving at, I think, is what you're saying a false positive is would be the result of operator error or some sort of a procedural error in the handling of the sample or the running of the test and not because of other substances in the donor's system?

Dr. Chang answered:

I say that today. I probably would not have said the five years ago when we first came out because how accurate a test is gets proved with time. As time goes on, I feel greater and greater confidence in the accuracy of the test. Yes, I do say that.

*Id.* at 111. Although Dr. Chang was not questioned on the misidentification of melanin fragments for cannabinoids, her conclusions are in direct contrast to Dr. Woodford's statement in his affidavit that "[d]ietary interferences and interferences from medication are not well understood in urinalysis and can cause false positive results." Affidavit ¶ 3 at 3. *See also* I.

Sunshine, et al., *Detection and Confirmation of Urinary Cannabinoids,* Journal of Analytical Toxicology 156 (July/August 1985); *but see Storms v. Coughlin,* 600 F.Supp. 1214, 1222 (S.D. N.Y.1984) (occurrence of false positives is a question of fact that survives a motion for summary judgment).

16. None of these subjects are intended to pertain to those portions of Dr. Woodford's affidavit that appear to attack the general accuracy and reliability of the tests, e.g. his challenges to cut off scores, or the four graphs in Court's Exhibit 6 which suggest to Dr. Woodford that GC/SIM rather than GC/MS tests were performed. For cases reviewing the general accuracy of the EMIT cannabinoid assay see, *e.g., Wykoff v. Resig,* 613 F.Supp. 1504, 1508–12 (N.D.Ind.1985) (collecting cases); *Peranzo v. Coughlin,* 608·F.Supp. 1504, 1512–15 (S.D.N.Y. 1985); *Jensen v. Lick,* 589 F.Supp. 35 (D.N.D. 1984). *Cf. Pella v. Adams,* 638 F.Supp. 94 (D.Nev.1986); *Jones v. McKenzie,* 628 F.Supp. 1500, 1505–07 (D.D.C.1986); *Storms v. Coughlin, supra* 600 F.Supp. at 1221–22.

The court does not regard it relevant to its scope of inquiry in this matter to deal with alleged errors of judgment or calculation by SmithKline in the conduct of the tests. The impact of such errors, if any, would appear not to bear on the plaintiffs' class-based claim of racial prejudice. Rather, the impact would be individual in nature.

2. Dr. Woodford's statements in ¶ 5 of his affidavit, specifically:

a. That whole melanin tends to hold and congregate drugs;

b. That high melanin content can change the marijuana clearance and detection time for an individual.

3. Records of armed forces labs, referred to by Dr. Woodford in ¶ 6 at page 6 of his affidavit, that made changes in their testing procedures based on his recommendations.

4. Some proof of the "studies," referred to in ¶ 6 at page 6 of the affidavit, that indicate that positive results for blacks in EMIT, RIA and GC/MS tests can be the result of melanin interference.

5. Provide some data of the "laboratory testing" for melanin interference performed by Dr. Woodford, referred to in ¶ 6 at page 6 of the affidavit, that allowed him to demonstrate an absolute correlation between marijuana positive and melanin positive results.

6. Dr. Woodford's statements in ¶ 6 at page 7 of his affidavit, specifically

a. That he demonstrated at the hearing how he could identify black officers by the signal area of their fragment ion accumulation;

b. That the additional signal area accounted for higher quantitative results for black personnel.

7. Identification of the case involving "Atlanta City Policemen and Firemen" referred to in ¶ 6 at page 6–7 of the affidavit.

8. With respect to Dr. Woodford's statements in ¶ 6 at page 7–8 of his affidavit regarding the "discrepancy between the levels detected by the screening tests and those found in confirming tests":

a. Identify the "other researchers" who have "noted" this discrepancy, and the conclusions they reached.

b. Identification of the study referred to on page 7 that compared specimens using different tests and reported that levels detected on EMIT and RIA do not correlate well with values obtained by GC/MS.

c. Some data that show that only a fraction of the total melanin interferences may filter through to the GC/MS detector.

d. Some data that refute the several sources referred to by defendants concluding that GC/MS test values theoretically *should* be lower than the EMIT and RIA values because GC/MS identifies only one THC metabolite.

9. Data that support the statement in ¶ 8 of the affidavit that the GC/SIM test is "less specific and less thorough than GC/MS," and that the GC/SIM test can have more racial bias.

10. Data that support the statement in ¶ 9 at page 9 that the results of cadets who showed above 20 ng/ml may be due to a combination of melanin interference and unintentional exposure.

11. More generally, has the melanin theory or any aspect of the melanin theory been tested with a scientifically acceptable experiment(s)? If so, provide data showing the design and conclusions of the experiment.

12. Data that show that the melanin theory has been published in any form or exposed in some manner for scrutiny by the scientific community.

13. Any data that scientifically challenge Dr. Elsohly's et al. experimental result disproving the melanin theory.

14. Ten of 20 minority cadets in the October 21, 1985 testing tested negative; 38 of 42 minority cadets in the November 1985 testing tested negative; and all of the 23 minority cadets in the May 12, 1986 testing tested negative. Data that supports why, if the melanin interference theory is valid, the above minority cadets and indeed *all* individuals with dark skin tone did not test positive on EMIT, RIA and GC/MS tests?

## V.

At a court meeting to be scheduled, the city is directed to produce for examination by the court, plaintiffs' counsel, and counsel for each intervenor all the documents that will reflect and verify the results of all urine testings conducted by the city with respect to police academy cadets subsequent to the October 21, 1985 testing.

At the same meeting plaintiff is directed to produce for examination by court and counsel all of the Dr. Woodford materials/submissions specified at pp. 285–86.

Apart from Dr. Woodford's theories discussed in Part IV, should the documentation of the EMIT and other assays reflect the results reported by the city for the testing of the 96th academy class, plaintiffs' claim of adverse discriminatory impact will fail. There will remain only the patent adverse impact of the EMIT, RIA and GC/MS tests, should the plaintiffs be able to sufficiently support the scientific acceptability or reliability of Dr. Woodford's melanin theory discrediting these assays. Upon examination of the documents to be exchanged and after oral argument, the court, consistent with the foregoing Memorandum and Order, will determine the future course of Shield Club's paragraph 7 discovery requests.

IT IS SO ORDERED.

### SUPPLEMENTAL MEMORANDUM AND ORDER

In accordance with the court's memorandum and order of July 15, 1986, and the court's findings and conclusions at the in-court hearing of October 17, 1986, the court enters the following findings:

1) based upon the in-court representations of plaintiffs' counsel the court finds that plaintiffs have not produced and have given no indication that they can produce the required documents and data to comply with the 14 questions in the court's July 15, 1986 memorandum and order regarding Dr. Woodford's melanin theory;

2) based upon the court's review of the records produced in court on October 17, 1986 by defendant City of Cleveland pursuant to part V of the court's July 15, 1986 memorandum and order, the court finds that none of the 45 cadets of the 96th Police Academy class (23 minorities and 22 non-minorities) tested positively for the drugs assayed. Accordingly, the court determines that the plaintiffs have failed to prove their claim that the mandatory urine tests have had an adverse discriminatory impact upon minority police cadets.

Therefore, plaintiffs' request, under paragraph 7 of the amended consent decree of December 21, 1984, for additional discovery of data relating to the urine testing of police patrol cadets is denied.

IT IS SO ORDERED.

### ORDER

Pursuant to Fed.R.Civ.P. 54(b), the court finds, as stated at the hearing of October 17, 1986, that there is no just cause for delaying entry of judgment denying plaintiffs' request for production of documents under paragraph 7 of the amended consent decree, as well as on the court's rulings in its July 15, 1986 memorandum and order.

Therefore, pursuant to Rule 54(b), it is ordered that the rulings made in the court's July 15, 1986 memorandum and order, the findings and conclusions made at the hearing of October 17, 1986, and the findings and conclusions made in the court's memorandum and order of November 5, 1986, constitute, and are here entered, as a final judgment.

Notwithstanding, the court retains continuing jurisdiction over this action for the express and limited purpose of enforcing the provisions of the amended consent decree of December 21, 1984.

IT IS SO ORDERED.

APPENDIX

AMENDED CONSENT DECREE

PRELIMINARY MATTERS

WHEREAS, plaintiffs have filed a motion to modify and to extend the consent decree entered in the these actions on November 11, 1977 and defendants, the City of Cleveland, et al., (the "City"), have filed briefs in opposition thereto; and

WHEREAS, the parties desire to finally and fully resolve these actions so as to preclude any further requests for extension and/or modification, and have therefore consented to the entry of this amended consent decree;

* 1. The purpose of the within consent decree is to resolve all outstanding matters pending in Nos. C72–1088 and C77–346 by way of a final order and to effectuate in effective prospective remedy designed to eliminate all vestiges of race discrimination within the City of Cleveland Police Department.

2. This order follows upon an extended history of hearings, findings and orders in C72–1088, including but not limited to the following: an order dated December 21, 1972 finding discrimination in the 1972 entrance examination [370 F.Supp. 251]; an order dated July 6, 1974 finding discrimination in the defendants' recruitment practices and defendants' post-examination screening practices [8 E.P.D. ¶ 9614]; an order also dated July 6, 1974 finding discrimination in the 1973 promotional criteria (examinations and seniority credit) [8 E.P.D. ¶ 9606]; an order dated September 27, 1976 finding intentional discrimination in the administration of assignments and transfers [14 E.P.D. ¶ 7763]; and an order dated September 29, 1976 finding intentional discrimination in the making of certain Sergeant promotions in 1975.

3. As reflected by the entire record in C72–1088 and C77–346, there has been a history of race discrimination in the hiring practices and in the promotion practices of the City of Cleveland's Police Department.

4. The plaintiffs have stated claims in C72–1088 under the Thirteenth and Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1981; 42 U.S.C. § 1983; and 42 U.S.C. § 2000d. The plaintiffs have stated claims in C77–346 under the Fourteenth Amendment to the United States Constitution; 42

IT IS THEREFORE HEREBY ORDERED AS FOLLOWS:

1. Paragraphs 1 through 8, inclusive, of the consent decree entered on November 11, 1977 are incorporated herein.*

HIRING

2. The defendants shall utilize only such selection criteria for the hiring of police officers as are non-discriminatory and demonstrably job related in a manner guided by the EEOC Guidelines on Employment Selection Procedures. The selection criteria referred to herein include, but are not limited to, the following:

a) entrance examinations; and

b) post-examination screening procedures. The previously approved

U.S.C. § 1981; 42 U.S.C. § 1983; 42 U.S.C. § 2000d; § 518(c)(1) of the Omnibus Crime Control and Safe Streets Act of 1968, as amended; and § 122(a)(1) of the State and Local Fiscal Assistance Act of 1972, as amended. The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1331; 28 U.S.C. § 1343(3) and (4); § 518(c)(4)(A) of the Omnibus Crime Control and Safe Streets Act of 1968, as amended; and § 124 of the State and Local Fiscal Assistance Act of 1972, as amended.

5. Civil Action No's C72–1088 and C77–346 are hereby consolidated pursuant to Rule 42(a), Federal Rules of Civil Procedure.

6. Plaintiffs are hereby granted leave to amend No. C77–346 to add the City of Cleveland as a party defendant and to state a claim under Title VII of the 1964 Civil Rights Act, as amended.

DEFINITIONS

7. "Minority" in this decree shall mean Black and Hispanic persons. "Hispanic" refers to Spanish speaking persons who were born or who are descended from persons who were born in Puerto Rico, Cuba, other Carribean countries or Mexico.

8. "Police officers" in this decree refers to male or female persons hired originally in the civil service category of "patrolman", "patrolwoman", "police officer" or the equivalent thereof and employed by the Cleveland Police Department. The term does not refer to civilian employees of the Department such as "para-police officers" or "police traffic controllers."

screening procedures (Court order dated April 22, 1976) may continue to be employed, except insofar as they may conflict with the other provisions of this order.

3. The "one in three" rule as prescribed in Chapter 131 of the Charter of the City of Cleveland may continue to be utilized except where its utilization frustrates or prevents compliance with this court order.

4. In order to partially remedy the present effects of past-discrimination in the selection of police patrol officers and in order to foster the employment of qualified minority police patrol officers by the defendants, the following temporary procedures are hereby ordered:

a) Temporarily and until such time as 33% of the police officers employed by the City are minorities or until December 31, 1992 (eight years), whichever time or event occurs first, defendants shall hire no less than three minority police patrol officers for every four non-minority police patrol officers, said ratio to be effectuated by the following methods:

(1) The vigorous recruitment of minority candidates for the job of police patrol officers, said recruitment to be carried on in the manner prescribed in Paragraph 5, *infra;*

(2) The continuation of the previously established seven point preference for residents of the City of Cleveland on all entrance examinations;

(3) Compliance, at the discretion of the defendants, with the point preference established recently by Cleveland's City Council for participants in the para-police program and the cadet traffic controller program;

(4) The use of the "one in three" rule set forth in § 131 of the Charter of the City of Cleveland in the manner referred to in this Court's order of December 21, 1972; and

(5) If necessary, the utilization, at the direction of the appointing authority, of separate lists for minority and nonminority candidates, otherwise qualified on the basis of a passing score on the entrance examination and on the basis of the satisfactory completion of the post-examination screening evaluation, as sanctioned by this Court's opinion of December 21, 1972.

b) In the event the defendants fail to hire a minimum number of 70 police patrol officers in any of the eight calendar years beginning January 1, 1985 and ending December 31, 1992, the hiring ratio described in Paragraph 4(a), above shall continue in full force and effect for one additional year for each year in which the City shall fail to hire the minimum number of police patrol officers, unless the City has otherwise achieved the 33% level set forth in paragraph 4(a) above.

c) Eligible lists shall have a life of two years. Should the defendants exhaust the pool of qualified minority candidates from any given list, the defendants shall administer new entrance examinations and shall prepare new eligible lists. Notwithstanding the foregoing, the City may, between January 1, 1985 and July 31, 1985, or until a new police patrol officer eligible list has been promulgated, whichever shall first occur, appoint police patrol officers from among the persons identified in the police patrol officer eligible list which was in effect between May 24, 1982 and May 23, 1984, and all appointments made therefrom shall be deemed as if they had been made from an eligible list in effect during the period of January 1, 1985 to July 31, 1985.

5. Vigorous recruitment of minority police patrol officers for the Cleveland Division of Police shall include, but shall not be limited to, the following methodologies:

a) The maintenance of a permanent, ongoing minority recruitment unit to be established within the Cleveland Division of Police and to be staffed by at least two full-time minority police officers to be chosen by the Chief of Police after

consultation with the Shield Club. The defendants shall cooperate fully with the recruitment unit and shall, *inter alia,* provide vehicles and supplies.

b) The conducting of an intensified recruitment effort for a period of no less than two months prior to the opening date for the acceptance of applications for all future entrance examinations, said effort to continue during the entire application period and to continue during the post application period to the extent of encouraging all minority applicants to appear for each component of the testing and screening process. At least 12 minority police officers shall be detailed full time during this intensified recruitment period and they shall be afforded the full cooperation of the defendants, including the provision of vehicles and supplies. Extensive minority media coverage shall be utilized and minority organizations such as the NAACP and the Urban League shall be contacted. Notwithstanding the foregoing two months requirement, an intensified recruitment effort shall be conducted for a period of no less, nor more, than 30 days prior to the opening date for the acceptance of applications for the entrance examination to be given during the first half of 1985.

## PROMOTIONS

6. All provisions in the original consent decree relating to promotions, and all orders relating to promotions made by the Court between November, 1977 and the present will expire on December 31, 1984. Nothing in this Amended Consent Decree shall be construed as in any manner whatsoever requiring any minority quotas or preferences with respect to promotions within the Division of Police of the City.

## OTHER MATTERS

7. The City shall provide to counsel of record for plaintiffs, within 30 days after any request by said counsel, any data relating to compliance with the provisions of this amended consent decree.

8. The amended consent decree shall be severable and a subsequent determination of the invalidity of any one paragraph or subparagraph of this decree shall not affect the remaining paragraphs or subparagraphs.

9. This amended consent decree shall be final and binding on all matters raised in C72–1088 and C77–346 except the question of compliance with this Court's orders of September 29, 1976 and May 31, 1977 on assignments and transfers over which this Court shall exercise independent scrutiny.

10. This decree shall be final and binding upon the parties hereto, their successors in office, and their officers, agents and employees.

11. All provisions of this amended consent decree shall remain in full force and effect for the periods defined in Paragraphs 4(a) and 4(b), above. The Court shall retain continuing jurisdiction over this action for the express and limited purpose of enforcing the provisions of this amended consent decree. The Court shall not have jurisdiction to further amend, modify or extend this amended consent decree.

The Court's jurisdiction shall not be extended, beyond the periods defined in Paragraphs 4(a) and 4(b), notwithstanding the fact that the purpose of this amended consent decree may not have been fully achieved.

/s/William K. Thomas
UNITED STATES DISTRICT JUDGE

Entered this 21st day of December, 1984.

APPROVED:

/s/John D. Maddox
JOHN D. MADDOX
Attorney for Defendants

/s/Harold L. Williams
HAROLD L. WILLIAMS
Attorney for Plaintiffs